IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| WILLIAM THOMAS JORDAN, § | |
| § | |
| Plaintiff, § | |
| § | |
| vs. § | CIVIL ACTION NO. 11-CV-03622 |
| § | |
| MICHAEL J. ASTRUE, § | |
| COMMISSIONER OF SOCIAL § | |
| SECURITY, § | |
| § | |
| Defendant. § | |

## MEMORANDUM AND RECOMMENDATION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry # 7). Cross-motions for summary judgment have been filed by Plaintiff William Jordan ("Plaintiff," "Jordan"), and Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #11); (Defendant's Cross-Motion for Summary Judgment, Docket Entry #12); (Memorandum in Support of Defendant's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry # 12-1). Each party has responded in opposition to the other's motion. (Defendant's Response to Plaintiff's Cross Motion for Summary Judgment ["Defendant's Response"], Docket Entry # 13); (Plaintiff's Response to Defendant's Memorandum in Support of Defendant's Cross Motion for Summary Judgment Filed July 12, 2012 ["Plaintiff's Response"], Docket Entry # 14). After a review of the pleadings, the evidence presented, and the applicable law, it is **RECOMMENDED** that Plaintiff's motion be **GRANTED**, and that Defendant's motion be **DENIED**.

1

## BACKGROUND

On February 24, 2009, Plaintiff William Thomas Jordan filed an application for disability insurance benefits under Title II of the Social Security Act ("the Act"). (Transcript ["Tr."] at 32, 99, 173). Plaintiff claimed that his disability began on September 15, 2005,[1] due to anxiety, depression, "mood swings," "anti[-]social" behavior, and high blood pressure. (Tr. 270). The SSA initially denied his application for benefits on April 30, 2009. (Tr. 99). Plaintiff petitioned the SSA to reconsider that decision, but that request was denied. (Tr. at 100).

On August 31, 2009, Plaintiff successfully asked for a hearing before an administrative law judge ("ALJ"). (Tr. 111-13). That hearing, before ALJ Robert N. Burdette, took place on January 6, 2010. (Tr. 47). Plaintiff was unable to attend because he was hospitalized at the time, but his wife, Susan Jordan, appeared for him. (Tr. at 50). The ALJ rescheduled the hearing for March 26, 2010. At that March 2010 hearing, Plaintiff appeared with an attorney, Donald Dewberry ("Mr. Dewberry"), and he testified in his own behalf. (Tr. 57). The ALJ also heard testimony from a medical expert witness, Daniel Hamill ("Dr. Hamill"), as well as a vocational expert witness, Cheryl Swisher ("Ms. Swisher"). (Tr. at 57).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1. An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

---

[1] In his motion for summary judgment, Plaintiff claims that his disability onset date was April 15, 2005, but in his application to the SSA, he listed September 15, 2005, as the date on which he "bec[a]me unable to work." (Tr. at 270).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well settled that, under this analysis, the claimant bears the burden to prove any disability that is relevant to the first four steps. *See Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability. *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). "Substantial gainful activity" is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ found that Jordan "did not engage in substantial gainful activity during the period from his alleged onset date of September 15, 2005 through his date last insured of September 30, 2008." (Tr. at 34). Further, the ALJ concluded that Jordan suffered from "hypertension causing chest pains; major depressive disorder; degenerative disc disease of the cervical spine; anxiety disorder; headaches; and right hip pain." (Tr. at 34). Although he determined that these impairments were "severe," the ALJ decided that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments" in the applicable SSA regulations. (Tr. at 35). The ALJ concluded that Plaintiff's residual functional capacity ("RFC") allowed him "to perform light work," with the following limitations:

> [H]e can lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 4 hours in an 8 hour workday; sit for 4 hours in an 8 hour workday secondary to hip pain; and must have the ability to change positions at will due to neck pain. Claimant should never climb ropes, ladder[s], or scaffolds and all other posturals are occasional. He is right hand dominant and is limited to frequent left overhead reaching secondary to left arm issues and frequent right gross manipulations secondary to his wrist issues. Claimant is also limited to simple 1, 2, 3 step tasks, incidental contact with the public and no assembly line or forced pace work.

(Tr. at 36). Based on those abilities, the ALJ determined that Jordan was unable to perform his past work as a warehouse worker, restaurant manager, and "cable puller," but that "there were jobs that existed in significant numbers in the national economy that [he] could have performed." (Tr. at 40). For that reason, he found that Jordan "was not under a disability, as defined in the

4

Social Security Act, at any time from September 15, 2005, the alleged onset date, through September 30, 2008, the date last insured," and he denied his application for insurance benefits on May 7, 2010. (Tr. at 29).

On May 25, 2010, Plaintiff requested an Appeals Council Review of the ALJ's decision. (Tr. at 27-28). The Appeals Council found no reason to review the ALJ's decision and denied his request, on June 30, 2011. (Tr. at 16). Plaintiff then submitted another request to the Appeals Council asking it to consider additional information. (Tr. at 11). The Appeals Council granted that request, on July 11, 2011. Subsequently, Plaintiff provided the Appeals Council with a brief in support of his appeal, as well as a "Ratings Decision" from the Veterans Administration ("VA"), dated January 25, 2010. (Tr. at 339, 367, 389-91). The Ratings Decision addresses the VA's evaluation of Plaintiff's service connected disabilities for "major depressive disorder" and headaches. In its decision, the VA raised Plaintiff's disability rating for depression from 30 percent to 50 percent, as of July 9, 2008, and it detailed its reasons for doing so. (Tr. at 339, 389). The VA also decided that Plaintiff's disability rating for headaches should be raised, from 10 percent to 30 percent, as of October 16, 2009. (Tr. at 339, 390). After "consider[ing] th[is] additional information," the Appeals Council advised Jordan that it had "found no reason" to review the ALJ's decision. (Tr. at 1). In that notice, dated September 13, 2011, the Appeals Council stated,

> We also looked at the additional evidence you submitted from the Department of Veterans Affairs from 2011 (228 pages, including cover pages). The Administrative Law Judge decided your case through September 30, 2008, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits.

(Tr. at 2). With that ruling, the ALJ's findings became final, and, on October 11, 2011, Jordan filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Complaint, Docket Entry #1). After a review of the pleadings, the

5

evidence presented, and the applicable law, it is **RECOMMENDED** that Plaintiff's motion be **GRANTED**, and that Defendant's motion be **DENIED**.

## STANDARD OF REVIEW

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about his condition; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126. If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Johnson*, 864 F.2d at 343.

## DISCUSSION

In his motion, Jordan asks the court to reverse the ALJ's decision and award him benefits, or, in the alternative, to remand the case for additional administrative proceedings. (*See* Plaintiff's Motion at 1). Jordan points to a number of alleged errors on the part of the ALJ in support of his motion. First, Plaintiff argues that, in determining his RFC, the ALJ failed to

6

"properly accommodate for [his] neck impairment," and that he did not make a specific finding that he has the ability to maintain employment. (Plaintiff's Motion at 7, 11). Jordan also complains that, in determining his mental RFC, the ALJ did not consider his "moderate impairment in social functioning." (*Id.* at 9) (emphasis omitted). In addition, Jordan claims that the ALJ did not discuss the weight that he gave to the opinions by the State agency physicians, and that he did not call a medical expert witness to testify about his physical impairments. (*Id.* at 10, 12-14). Finally, Jordan complains that the ALJ "gave no weight" to the VA disability ratings that were in evidence, nor did the Appeals Council properly consider the additional disability decision from the VA that was submitted after the hearing. (Plaintiff's Response at 4-7). Defendant, on the other hand, insists that "[s]ubstantial record evidence and relevant legal standards support the ALJ's decision." (Defendant's Motion at 12).

*Medical Facts, Opinions, Diagnosis*

The majority of the medical evidence is from the Michael DeBakey Houston Veterans Administration Medical Center ("VA Medical Center"), and it dates from March 11, 1997, to June 13, 2011.[2] (Tr. at 397-2587). While undergoing treatment at the VA Medical Center, Jordan was seen by a number of different physicians. It appears that he saw Nancy B. Rubio, M.D. ("Dr. Rubio"), a psychiatrist, most often for depression, and that Radha Rao, M.D. ("Dr. Rao") frequently treated his physical ailments. (Tr. at 516, 805). The reports detail Plaintiff's treatment for hypertension, depression, headaches, "[n]icotine [d]ependence," right hip and leg pain, a "tingling" in his arms, as well as his efforts at drug rehabilitation. (Tr. at 485, 500, 969, 1234, 1325).

Some of the earliest records include details of Plaintiff's visits to his mental health case manager, Marion Wright ("Ms. Wright"), and address his attempts to maintain sobriety. (Tr. at 1386-1400, 1423-1569). On September 9, 2005, Ms. Wright wrote that Jordan "remains

---

[2] Plaintiff entered military service on November 5, 1979, and received an honorable discharge on December 6, 1982. (Tr. at 425).

7

involved in [the] VA[] [T]herapeutic Work for Pay Program," and is "assigned to the Housekeeping Department working three days per week." (Tr. at 1383). Plaintiff reported to her that he sought regular employment as well, but that he found "it difficult due to having felonies." (Tr. at 1383). A note dated December 23, 2005, reveals that, after completing a substance abuse program in October 2005, Jordan went to a "crack house to pick-up a female friend and [] relapsed." (Tr. at 1570). Plaintiff's case manager apparently disclosed this "relapse," and reported the following incident as a result:

> [Jordan] continued to state that his rights were violated and [that] he could no longer trust [me]. He reported wanting to change Case Manager[s] but would not follow through when directed to schedule staffing with [a new] treatment team. Patient attended [his] first Relapse Group[,] []which [I] facilitated and he was asked to leave due to oppositional behavior. Several attempts were made to discuss the issue of his anger and resentment ... to no avail.... [The] [t]eam decision was to discharge [him] from SDRS [Substance Dependence Rehabilitation Section] and [allow him to] return in thirty-days. Patient was informed and agreed to [this] decision.

(Tr. at 1570-71).

On May 4, 2005, VA Medical Center notes show that Plaintiff was rated as disabled, because of "hypertensive vascular disease." (Tr. at 1656). On December 20, 2005, Plaintiff went to the emergency room at the VA hospital, complaining of chest pain. (Tr. at 1577). He reported suffering from "chest pain and headaches since 1982," and that they were "[u]sually related to blood pressure." (Tr. at 1577). Jordan claimed that, "since 2004," he has had "problems regulating his blood pressure." (Tr. at 1577). Stephanie Simmons, the physican's assistant who attended him that day, recommended that he "continue [his] medications as ordered by [his] P[rimary] C[are] P[hysician]." (Tr. at 1578). The next week, Plaintiff underwent a chest x-ray, which showed "no evidence of cardiopulmonary disease," and that his "scoliosis ... [was] unchanged." (Tr. at 428, 946-47). The following month, Plaintiff underwent an additional x-ray of his back, which showed "[d]egenerative changes," and a "[m]arked narrowing [of the] C 5/6 with sclerosis." (Tr. at 420). On March 27, 2006, the VA

8

rated Plaintiff's "eligibility" for "service connected" disability benefits to range from "50% to 100%." (Tr. at 439); *see also* (Tr. at 436).

On May 23, 2006, Jordan was evaluated by Tony Ma, M.D. ("Dr. Ma") at the VA Medical Center, who determined that he suffered from "uncontrolled and long-standing" hypertension, with "evidence of hypertensive heart disease." (Tr. at 440). Three months later, on August 25, 2006, Radha Rao, M.D. reported the following:

> My relationship with this [patient] has been a very long and tedious one. The [patient] has a former [history of] substance abuse. [The patient's] attitude usually has [included a] very demanding, belligerent, badgering manner of questioning, [and is] manipulative in nature. [He] has complained of chest pains several times[,] ... [but my] final impression is that [the] c[hest] p[ain] is most likely ... from uncontrolled [hypertension] and he would benefit from aggressive b[lood] p[ressure] control. [He] has asked me to write him numerous letters ranging from he can work only four hours [per] day, then changed to he could attend chef school, then changed to 8 hours [per] day []based on the fact that he is having chest pains. I have a feeling [that] the [patient] is noncompliant with [his hypertension med[ication]s and is trying to increase his service connection related benefits based on his medical issues (particularly [hypertension])[,] so that he will not have to work. Today [he] again [complained of] chest pains and an EKG/Cardiac Enzymes done were negative for ischemia.[3] He was not satisfied with the answer and argued with me that a Troponin[4] of .01 was indeed positive. Based on all of the above I have suggested to Mr. Jordan ... that he would benefit from another provider.

(Tr. at 1372) (emphasis omitted).

On March 20, 2007, Plaintiff went to the emergency room at the VA Medical Center, complaining "mostly [] [of a] headache," which "started [two] weeks ago... [and] fe[lt] like [a] door opening [and] closing in his brain." (Tr. at 1325). Dr. Alexis Schmitt treated Plaintiff that day, and reported the following:

> [Plaintiff] asked to see me again at [his] time of discharge and [he] was extremely mad that he had been given hydralazine to decrease [his] b[lood] p[ressure] and that I had ordered a u[rine] tox[icology] test. [H]e was afraid that his b[lood]

---

[3] "Ischemia" is "a decreased supply of oxygenated blood to a body organ or part." MOSBY'S at 876.
[4] "The troponin test measures the levels of certain proteins called troponin T and troponin I in the blood. These proteins are released when the heart muscle has been damaged, such as a heart attack. The more damage there is to the heart, the greater the amount of troponin T and I there will be in the blood." U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplus/ency/article/007452.htm (last visited February 12, 2013).

9

> p[ressure] would "bottom out", although after he was told it was 154/90 he was upset [that] it was still too high.
> In addition, he told me he was very upset that I checked a drug screen on him before I [] even s[aw] him. I explainied that it was standard procedure in a young patient with chest pain. I told him it was "routine", not personal. He yelled "everything is personal now." I continuously had to ask him to calm down and not yell in order to have a productive conversation and try to help him. When he continued yelling and accusing me of not treating him appropriately I told him he was welcome to get a second opinion from his primary care physician and asked that police escort him out. At that point, I was scared that he might become aggressive and hurt me or disturb other patients being treated in the emergency room.
> At [the] time of discharge (prior to his outburst) he told me that his pain was "significantly better, that he really had not come in for his c[hest] p[ain] because that was a chronic thing and that, his hip/leg pain was the worst, and that he wanted an explanation for his h[ead]a[che] which had been relieved greatly. Medically, he left in stable condition, improved (before outburst) with a lowered blood pressure and instructions to restart [Hydrochlorothiazide],[5] take [T]ylenol or ibuprofen [] for arthritis in the hip[,] and [to] continue all other mediations.

(Tr. at 1334).

On November 7, 2007, Martin H. Keeler, M.D. ("Dr. Keeler"), a psychiatrist, examined Plaintiff on behalf of "DDS." (Tr. at 398-402). He noted that there were no medical records to review prior to the examination, which he found to be "a major problem because the patient base[d] most of his inability to work on physical symptoms and the effects of the medications that he ... take[s] for the physical symptoms." (Tr. at 398). Dr. Keeler reported that Jordan believed that his "depression and anxiety ... [were] the result of his physical symptoms." (Tr. at 398). Jordan told Dr. Keeler that he "used crack cocaine daily for 15 years," and that he had "ha[d] difficulties with alcohol for most of his adult life." (Tr. at 400). However, Plaintiff also reported that he had "joined AA," and that he now "attends two meetings daily." (Tr. at 400). Dr. Keeler found Jordan to be of "average intelligence," and that he "answered questions accurately," "elaborated appropriately," and "was logical, coherent, and relevant." (Tr. at 401). Dr. Keeler concluded that Plaintiff suffered from "Depression NOS [Not Otherwise Specified],"

---

[5] "Hydrochlorothiazide, a 'water pill,' is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease." U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (last visited February 12, 2013).